## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **GARY N. WITT,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 05 C 0003 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Martin C. Ashman |
| **JO ANNE B. BARNHART,** | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Gary N. Witt, seeks judicial review of the final decision of Defendant,

Jo Anne B. Barnhart, the Commissioner of the Social Security Administration ("SSA"), who

denied Witt's application for Disability Insurance Benefits ("DIB") and Supplemental Security

Income payments ("SSI"). The Commissioner moves this Court to uphold her decision. The

parties have consented to have this Court conduct any and all proceedings in this case, including

the entry of final judgment. *See* 28 U.S.C. § 636(c); Local R. 73.1(a). For the reasons set forth

below, the Commissioner's final decision is affirmed in part, reversed in part, and remanded for

further proceedings in accordance with sentence four of 42 U.S.C. § 405(g).

## I.   Background

### A.   Procedural History

Witt filed a claim for DIB on November 6, 2001. (R. at 14.) After reviewing his claim,

the Commissioner found that Witt was not disabled and denied him benefits. (R. at 26.) Witt's

motion for reconsideration was denied on March 6, 2002. (R. at 31-32.) Witt then filed a request for a hearing by an administrative law judge ("ALJ"). (R. at 36.) Although Witt exceeded the sixty-day limit for this request, because Witt's failure to file on time was for "good cause," the ALJ William J. Wilkin agreed to a hearing. (R. at 14.) The ALJ hearing was held on June 3, 2003, in Gary, Indiana. (Id.) At the end of the hearing, the record was left open so that Witt could provide additional medical evidence, which he did. (Id.) After the ALJ received all the medical evidence, the ALJ denied Witt disability benefits on May 14, 2004. (R. at 21.) Witt's appeal to the Social Security Appeals Council was denied on November 18, 2004, making the ALJ's decision the final decision of the Commissioner. (R. at 3.) Witt now seeks judicial review of that decision.

### B.    Factual Background

#### 1.    Education and Work History

Witt was born on June 28, 1960, and was forty-two years old at the time of the ALJ hearing. (R. at 241.) Witt was placed in special education classes all of his life. As a special education student, Witt completed high school in four years and graduated with a high school degree in 1980. (R. at 204, 243.)

After graduating from high school, Witt held a variety of jobs. Beginning in 1980, Witt worked as a janitor and cleaner for Dominick's grocery store. (R. at 244.) In 1988, Witt quit the Dominick's job with the hope of finding a new job that would pay more money. (R. at 247.) Witt found a better paying job at U.S. Wire and Tie Systems, where he worked as a janitor from 1988 until 1990. (R. at 248.) From 1990 until 1996, Witt worked as a bus washer and laborer

- 2 -

for Van-Com. (R. at 248-50.) In 1996, Witt worked briefly as a janitor and forklift operator for Chicago Disposal. (R. at 251.) Later that same year, Witt worked as a burner at Arcon for one week but was then let go. (R. at 252-54.) Finally, Witt took a job in the produce section of Ken's Finer Foods but worked only three weeks before the store closed down for the winter. (R. at 254-56.) According to Witt, he has not been able to work since September 14, 1999. (R. at 257.)

### 2. Medical Evidence

Witt presented evidence from three doctors concerning his physical aliments. Dr. Nanette Fabi, M.D., examined Witt three times from 1998 to 2001. In February 1998, Dr. Fabi examined Witt for mild hearing loss in the right and left ear. (R. at 143.) Dr. Fabi found that Witt had "excellent" speech discrimination in both ears at comfortable loudness levels. (Id.) After a 1999 exam, Dr. Fabi found that Witt suffered from allergic rhinitis and prescribed him Claritin-D and Flonase. (R. at 136.) In October 2001, Dr. Fabi gave Witt a physical exam and noted that Witt was experiencing hypoglycemia and painful sex. (R. at 124-28.) Dr. Fabi arranged for chest x-rays on December 12, 2001. Those x-rays were consistent with an old, healed chest infection. (R. at 128.)

On December 13, 2001, Witt received an internal medical examination from Dr. Dinesh K. Jain, M.D., regarding a right inguinal hernia, aching pain in his left big toe, and continual headaches. (R. at 144.) Dr. Jain reported that Witt claimed he could lift up to fifty pounds and that Witt believed he had a hernia but had never gone to a doctor for testing or surgery because he did not have any money. (Id.) Witt also told Dr. Jain that he had no history of loss of consciousness or emergency room visits but did experience frontal headaches and

lightheadedness at times. (Id.) The headaches were intermittent, lasting for one or two hours and had no other neurological deficits. Witt denied any chest pain or shortness of breath. Witt did not take any prescription medication. (R. at 145.) Dr. Jain checked both hernia sites in the inguinal region and found "[v]ery minimal fluctuation in the right inguinal region without clear cut evidence of right inguinal hernia." (R. at 146.) Dr. Jain found the condition of Witt's toe "unremarkable," Witt's upper and lower extremities ranges of motion "normal," Witt's neurological functions "normal" and "intact" with no signs of past head trauma, and Witt's spine curvature "normal," with no tenderness and "normal" ranges of motion. (R. at 145-46.)

In December 2001, Dr. Manzoor Hussain, M.D., treated Witt for chronic obstructive pulmonary disease (COPD). (R. at 154.) At the time, Witt's forced vital capacity and forced expiratory volume in one second (FEV1) were within normal limits and failed to improve significantly with a single dose of a bronchodilator. (R. at 152.) Witt's forced expiratory flow (FEF) 25-75% was moderately reduced and improved from 72% to 90% of predicted with single use of bronchodilator. (Id.)

On January 3, 2002, state agency physician Dr. Roxanne Vennell reviewed Witt's medical records and concluded that Witt could perform medium work, lifting up to twenty-five pounds frequently and fifty pounds occasionally, standing and/or walking and sitting for about six hours each in an eight hour workday. (R. at 155-62.) A state agency medical consultant also reviewed the record and concurred in Dr. Vennell's assessment. (R. at 162.)

In August 2002, Witt had a nail bed removed. (R. at 167.) And in September 2002, Witt filled a prescription for an Albuterol inhaler, which had been prescribed by Dr. Hussain. (R. at 168.)

- 4 -

Although he claimed mental impairments, Witt failed to submit psychological evidence at the ALJ hearing so the ALJ ordered a psychological consultative evaluation with IQ testing at the Commissioner's expense. (R. at 17.) Before Witt was evaluated by the ALJ-appointed psychologist, however, Witt received his own evaluation from Dr. Douglas Caruana, Psy.D., on October 16, 2003. Dr. Caruana performed a psychological evaluation, including IQ testing (WAIS-III) and found Witt to have a verbal IQ of 67, performance IQ of 81, and full scale IQ of 72. (R. at 72.) Dr. Caruana also found that (1) Witt is "alert, variable in orientation, and slow in responding to his environment," (2) Witt has a "weakness in simple memory and in thought organization," and (3) Witt's intellectual abilities are at the "low end of the borderline range, with a Verbal IQ in the mild mental retardation range." (Id.)

The ALJ-appointed psychologist, Dr. Jeffrey Karr, Ph.D., examined Witt on November 18, 2003. (R. at 169.) Dr. Karr examined Witt's IQ (WAIS-III) and found him to have a verbal IQ of 66, performance IQ of 76, and a full scale IQ of 68. (Id.) Dr. Karr described Witt's speech as "blunt-concrete . . . limited to 2 or 3 words at a time, spoken coherently, [and] accompanied by limited eye contact." (R. at 171.) Dr. Karr found that Witt required repeated instructions and became discouraged easily, despite adequate cooperation. (Id.) However, Witt did not show any signs of physical discomfort and smiled at appropriate times. (Id.) Witt was kempt in appearance and displayed no motor restlessness. (Id.) Testing reflected some difficulty in attention to detail and response time and subsequent orientation, as well as difficulty with short term attending. (Id.) Witt performed design reproductions perfectly and answered several math and reasoning questions correctly. (Id.) Witt also answered several questions incorrectly. (Id.) Dr. Karr stated that Witt did not suffer from a clinical disorder (an Axis I diagnosis), but

did have a learning disorder, not otherwise specified (an Axis II diagnosis). (R. at 172.) He also noted that Witt had multiple somatic concerns. (Id.)

Dr. Karr made observations regarding Witt's daily activities. Dr. Karr reported that Witt watches science fiction, works on model trains, shops with his wife, talks with relatives on the phone, plays video games, makes jewelry, sews, does woodworking, goes out dancing at clubs, and occasionally attends church. (R. at 170.) Witt shares responsibility for cooking and household chores with his wife, but depends on her for laundry and shopping. (Id.) Witt reported no psychiatric history or symptoms and took no medication. (Id.)

Finally, Dr. Karr completed a medical source statement of Witt's ability to perform work-related mental activities. Dr. Karr found that Witt had no limitation in his ability to understand, remember, and carry out short, simple instructions, but was markedly limited in his ability to understand, remember, and carry out detailed instructions. (R. at 173-74.) Dr. Karr considered Witt moderately limited in his ability to make judgments on simple work-related decisions. Dr. Karr concluded that Witt's ability to respond appropriately to supervision, co-workers, and work pressures in a work setting was not affected. (R. at 174.)

3. ALJ Hearing Testimony

Witt testified at the ALJ hearing and described the physical pain he experiences. According to Witt, his greatest physical impairment is his hernia. (R. at 259.) Witt does not know how the hernia developed but he claims that it causes him pain one to three times a week. (R. at 276.) Witt stated that lifting, walking, and standing for over fifteen minutes can bring on the pain, and at times the pain occurs independent of any physical activity. (R. at 269, 276.)

Witt also stated that he has sinus headaches every other day due to his inability to clear his left nasal passage and that these headaches sometimes last all day. (R. at 291-92.) Witt claimed that he experiences pain in his wrist and that his wrist "goes out" after repetitive motion and lifting. (R. at 282-84.) Witt was not sure if he could lift twenty pounds and said that five pounds "would be even better. Ten pounds is still kind of heavy." (R. at 271.)

At the ALJ hearing, Witt described his daily activities and social life. Witt drives to the grocery store occasionally and does some grocery shopping, however, his wife does most of the house maintenance and cooking. (R. at 262, 264, 266.) Witt is a good driver and he once drove one hundred and fifty miles on a road trip. (R. at 263-64, 307.) According to Witt, he is able to dance and ride a bicycle but has not engaged in these activities lately. (R. at 285-86.) He also goes bowling "once in a blue moon." (R. at 285.) Witt claimed that he does not really have any hobbies right now, that he mostly stays at home and watches television, and that the farthest he has walked lately is half a mile. (R. at 265, 270.)

Finally, Witt claimed to suffer from a variety of mental impairments. Witt has lived with his mother all of his life and, as mentioned above, he was in special education courses his entire academic career. (R. at 304.) Witt testified that his mind often wanders and that he has difficulty concentrating and focusing. (R. at 286-88.) Witt also stated that in 1996 he had a vision of his deceased grandmother speaking to him. (R. at 297.)

Witt's wife testified that she has known Witt for three-and-a-half years and has lived with him for two years. (R. at 301.) The two were married in February 2003, about three months before the ALJ hearing. Witt's wife stated that on a scale from one to ten, Witt's concentration level is a two and his attention span is less than five minutes. (R. at 304.) She also testified that

Witt's headaches are so severe that he has difficulty breathing and sleeping, that his hernia causes him pain on a regular basis, including when he lifts as little as two pounds, and that Witt suffers from back pain. (R. at 305-06.) Witt's wife also believes that he is depressed on a regular basis. (R. at 303.) According to his wife, when Witt drives a car someone must tell him where to go or he will get lost. (R. at 307.) Witt's wife receives social security disability insurance. (R. at 273.)

Clifford Brady, a vocational expert ("VE"), testified at the ALJ hearing. The ALJ presented four hypotheticals to the VE. Hypothetical One created a scenario where Witt had medium-work function, could lift no more than fifty pounds, required a clean work atmosphere, and was limited to a "simple one, two-step job requiring only low degrees of concentration." (R. at 311.) The VE found that under these conditions Witt could return to his past work as a janitor and cleaner at Dominick's and U.S. Wire and Tie Systems but noted that he was not sure all of Witt's past work would be considered one or two-step operation activities, preferring to describe them as simple and repetitive. (R. at 312.) The ALJ's Hypothetical Two gave Witt a residual functional capacity ("RFC") for light work and was the same as Hypothetical One, except that Witt was limited to lifting twenty pounds. (R. at 313.) Under Hypothetical Two's conditions, the VE found that Witt could return to his work as a janitor for U.S. Wire and Tie Systems and potentially his old bus washing job. (Id.) The ALJ's Hypothetical Three proposed a RFC for sedentary work, with no lifting over five to ten pounds, and again limited Witt to simple, "one- and two-step" jobs with low degrees of concentration and a clean atmosphere. (Id.) Under Hypothetical Three's conditions, the VE found Witt could not perform any past work but could perform a variety of unskilled, sedentary jobs in the Chicago and Northwest Indiana area. (R. at 313-14.) In the ALJ's Hypothetical Four, Witt could have a RFC for medium, light, or sedentary

work but could not sustain eight hours of daily work. (R. at 314.) In that case, the VE found Witt would be precluded from performing full time work. (Id.) The VE also found that if Witt could not perform repetitive motions with his left wrist, then Hypotheticals One, Two, and Three would be adversely affected—Hypothetical Three drastically so. (R. at 315.)


## C.   ALJ's Findings

The ALJ made the following specific findings:

1.   The claimant meets the nondisability requirements for a period of
     disability and Disability Insurance Benefits set forth in Section
     216(i) of the Social Security Act and is insured for benefits through
     the date of this decision.

2.   The claimant has not engaged in substantial gainful activity since
     the alleged onset of disability.

3.   The claimant has the flowing "severe" impairments: inguinal
     hernia, allergic rhinitis, mild COPD and a learning disorder (20
     C.F.R. §§ 404.1520(c) and 416.920(b)).

4.   These medically determinable impairments do not meet or
     medically equal one of the listed impairments in Appendix 1,
     Subpart P, Regulation No. 4.

5.   The claimant's allegations regarding his limitations are not totally
     credible for the reasons set forth in the body of the decision.

6.  The claimant has the following residual functional capacity: he can lift/carry 25 pounds frequently and 50 pounds occasionally, and sit, stand and/or walk 6 hours each during an 8-hour day. The claimant is limited to simple, one- and two-step jobs requiring a low degree of concentration. Finally, the claimant must work in a clean atmosphere.

7.  The claimant's past relevant work as a janitor, a bus washer and a cleaner did not require the performance of work-related activities precluded by his residual functional capacity (20 C.F.R. §§ 404.1565 and 416.965).

8.  The claimant's medically determinable impairments do not prevent him from performing his past relevant work.

9.  The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 C.F.R. §§ 404.1520(f) and 416.920(f)).

The ALJ concluded that Witt is not entitled to a period of disability, DIB, or SSI under Sections 216(i), 223, 1602, and 1614(a)(3)(A) respectively, of the Social Security Act. (R. at 21.)

## II.  Discussion

### A.  Standard of Review

42 U.S.C. § 405(g) authorizes judicial review of the Commissioner's decision to deny

Social Security benefits.  "The findings of the Commissioner of Social Security as to any fact, if

supported by substantial evidence, shall be conclusive . . . ."  Id.  Substantial evidence is defined

as "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  In determining whether

substantial evidence exists, this Court shall examine the record in its entirety, but shall not

substitute its own opinion for the ALJ's by reconsidering facts or reweighing evidence.  *Jens v.*

*Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).  However, this Court reviews the ALJ's findings of

law *de novo* and if the ALJ makes an error of law, the Court may reverse without regard to the

volume of evidence in support of the factual findings.  *White v. Apfel*, 167 F.3d 369, 373 (7th Cir.

1999).


### B.  Establishing Disability

In order for a claimant to be eligible for DIB under the Social Security Act, the claimant

must establish that he or she is disabled.  To qualify as being disabled, the claimant must be

unable "to engage in any substantial gainful activity ["SGA"] by reason of any medically

determinable physical or mental impairment which can be expected to result in death or has

lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42

U.S.C. § 416(i)(1).  Under 20 C.F.R. § 404.1520, the ALJ performs a five-step evaluation to

determine whether a claimant has satisfied the statutory definition of disabled. The five steps are:

> Step 1: Is the claimant performing substantial gainful activity? If yes, the claim is disallowed; if no, the inquiry proceeds to Step 2.
>
> Step 2: Is the claimant's impairment or combination of impairments "severe" and expected to last at least twelve months? If not, the claim is disallowed; if yes, the inquiry proceeds to Step 3.
>
> Step 3: Does the claimant have an impairment or combination of impairments that meets or equals the severity of an impairment in the SSA's Listing of Impairments, as described in 20 C.F.R. § 404, Subpt. P, App. 1.? If yes, then claimant is automatically disabled; if not, then the inquiry proceeds to Step 4.
>
> Step 4: Is the claimant able to perform her past relevant work experience? If yes, the claim is denied; if no, the inquiry proceeds to Step 5 where the burden of proof shifts to the Commissioner.
>
> Step 5: Is the claimant able to perform any other work within her residual functional capacity in the national economy? If yes, the claim is denied; if no, the claimant is disabled.

20 C.F.R. § 404.1520(a)(4)(i)-(v). *See also Herron v. Shalala*, 19 F.3d 329, 333 n.8 (7th Cir. 1994). At the fourth and fifth steps of the five-step inquiry, the ALJ must consider an assessment of the claimant's RFC. The RFC is an assessment based upon all of the relevant evidence of what the claimant can still do despite his limitations. 20 C.F.R. § 404.1545(a). In other words, the RFC is the most Witt can do, not the least. Id. The RFC assessment helps to evaluate the

types of work available to an individual with particular limitations. Id. The final responsibility for deciding a claimant's RFC rests with the ALJ. 20 C.F.R. § 404.1527(f)(2). The claimant bears the burden of proof through Step 4 of the five-step inquiry; the burden shifts to the Commissioner at Step 5. *Herron*, 19 F.3d at 333 n.8. Ultimately, the ALJ weighs the medical and testimonial evidence presented and, when he denies benefits, he must build an accurate and logical bridge from the evidence to his conclusion. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

In the present case, the ALJ denied Witt's petition for DIB at Step 4. The ALJ found that Witt satisfied Steps 1 and 2 because he found that a combination of "an inguinal hernia, allergic rhinitis, mild COPD and a learning disorder" constituted a "severe" impairment. (R. at 18.) However, the ALJ found that Witt did not meet a listed impairment at Step 3, could return to his past relevant work at Step 4, and could perform work in the national economy at Step 5. Witt challenges the ALJ's findings and argues that he qualifies for disability under Step 3 because he meets the SSA's Listing for mental retardation. Witt also argues that the ALJ's Step 4 and Step 5 findings are flawed because the ALJ failed to use the Commissioner's special technique for assessing mental impairments, failed to properly determine Witt's mental or physical RFC, improperly relied on the VE's responses to flawed hypotheticals, and improperly denied Witt a supplementary hearing.

## C.    Step 3 Analysis

A claimant will qualify as disabled if his impairment or combination of impairments meets or equals the severity of an impairment in the SSA's Listing of Impairments. Witt claims

that he meets or equals the SSA's listing for mental retardation, Listing 12.05. Listing 12.05 is

set out in 20 C.F.R. § 404, Subpt. P, App. 1, § 12.05, and contains an introductory paragraph

("the capsule") as well as four subsections. The capsule to Listing 12.05 reads:

> 12.05 *Mental retardation:* Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.
>
> > The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

Subsection (C) of Listing 12.05 reads:

> C.     A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

While there has been some debate in the past, the SSA now holds that, in order to meet

Listing 12.05, a claimant must satisfy the diagnostic description of mental retardation set out in

the capsule, as well as the criteria set out in one of the four subsections that follows.[1]  68 Fed.

Reg. 74279-01, 74280. Thus, in order to meet all the requirements of Listing 12.05(C), a

claimant must satisfy a three-part test: (1) the claimant must have a valid verbal, performance, or

full scale IQ of 60 through 70, (2) the claimant must demonstrate physical or mental impairments

---

[1] *Barnes v. Barnhart*, 116 Fed. Appx. 934, 938-939 (10th Cir. 2004) (unreported), succinctly describes the dispute as to whether the capsule definition must be met.  In September 2000, the SSA issued a decision stating that the capsule definition was a required element to establish, in addition to the IQ and the physical/mental limitation requirements of subsection (C).  *Id.*; 65 Fed. Reg. 50746-01, 50776. In *Blakes v. Barnhart*, 331 F.3d 565, 570-71 (7th Cir. 2003), the Seventh Circuit remanded a case for further proceedings and directed the ALJ not to consider whether the claimant satisfied the capsule definition because the case had occurred prior to the September 2000 Social Security ruling.  In response, the SSA issued a second ruling, stating that *Blakes* was decided incorrectly and that the capsule definition must be met.  68 Fed. Reg. 74279-01, 74280.

imposing additional and significant work-related limitations of function, and (3) the claimant must meet the diagnostic description of mental retardation set out in the capsule.

In this case, the ALJ appears to agree that parts one and two of Listing 12.05(C)'s test are met, but not part three. First, Witt meets the IQ requirements for Listing 12.05(C) because Dr. Caruana found that Witt had a verbal IQ of 67 and Dr. Karr found that Witt had a verbal IQ of 66 and a full scale IQ of 68. (R. at 17-18.) Second, Witt satisfies the significant impairment requirement of Listing 12.05(C), as the ALJ found Witt's physical and mental impairments to be "severe."[2] *See Maresh v. Barnhart*, 438 F.3d 897, 900 (8th Cir. 2006) (significant work related limitation will have more than slight or minimal effect on ability to perform work). Finally, the ALJ found that Witt did not meet part three—diagnostic description of mental retardation set out in the capsule—because Witt "does *not* carry a diagnosis of mental retardation, presumably due to an *absence* of deficits in adaptive functioning initially manifested prior to age 22." (R. at 18.) Witt challenges the ALJ's conclusion and argues that (1) the diagnostic description set out in the capsule does not require him to produce a formal diagnosis of mental retardation and (2) he satisfies the diagnostic description set out in the capsule because the record demonstrates that he suffers deficits in adaptive functioning that initially manifested prior to age twenty-two.

_____

[2] While the ALJ did find a severe impairment at Step 2 of his analysis, the Court notes that the ALJ was doubtful that Witt was actually severely impaired and exercised great discretion in relying on the credibility of Witt's testimony.

1.    Listing 12.05 Does Not Require a Formal Diagnosis of
      Mental Retardation.

As an initial matter, a formal diagnosis of mental retardation is not the only way to satisfy

the diagnostic description set out in the Listing 12.05 capsule.  While the Seventh Circuit has not

specifically addressed the issue, in *Maresh*, 438 F.3d at 899, the Eighth Circuit found that

nothing in the plain language of the regulation indicates that a claimant must provide a formal

diagnosis of mental retardation to satisfy the capsule.  *Id.*  This finding is consistent with the

Social Security Ruling ("SSR") that found the "definition of [mental retardation] used by SSA in

the listings is not restricted to diagnostic uses alone, nor does it seek to endorse the methodology

of one professional organization over the other."[3]  67 Fed. Reg. 20,022.  Persuaded by *Maresh*,

the Court finds that, in order to satisfy Listing 12.05's capsule requirement, a claimant must

satisfy the diagnostic *description*, i.e., deficits in adaptive functioning manifested prior to the age

of twenty-two, and need not produce a formal diagnosis of mental retardation.[4]

---

[3]  Social Security Rulings are binding upon all aspects of the SSA.  20 C.F.R.
§ 402.35(b)(1); *Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999).

[4]  The Commissioner cites to *Fischer v. Barnhart*, 309 F. Supp. 2d 1055, 1062-63 (N.D.
Ill. 2004), where the court found that a claimant must carry a "diagnosis of mental retardation" to
satisfy Listing 12.05(C).  The Court finds the Eighth Circuit's interpretation of Listing 12.05(C)
more persuasive than the holding in *Fischer*, but also notes that the *Fischer* Court could
reasonably place more weight on formal evidence of mental retardation because the claimant had
undergone two psychological evaluations prior to age twenty-two, one of which found him to
have "normal intellectual skills."  *Id.* at 1063.

2.      The Record Does Not Reveal Significant Limitations in
        Adaptive Functioning That Initially Manifested Prior To
        Witt Turning Twenty-Two Years Old.

Witt argues that he meets the capsule definition in Listing 12.05 because he suffers

deficits in adaptive functioning that initially manifested prior to age twenty-two. According to

the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV), a manual published by

one of the professional organizations endorsed by the SSA, in order to be mentally retarded an

individual must have significant limitations in adaptive functioning in at least two of the

following skill areas: communication, self-care, home living, social/interpersonal skills, use of

community resources, self-direction, functional academic skills, work, leisure, health, ad safety.

DSM-IV at 39. Witt claims that he meets the DSM-IV definition of mentally retarded because

his deficits in adaptive functioning include (1) below average intellect and poor academic skills,

(2) the inability to live without the support of others, (3) limited social and interpersonal

relationships, and (4) a diagnosis of mild mental retardation by Dr. Caruana. Witt also concludes

that his case is similar to *Barnes v. Barnhart*, 116 Fed. Appx. 934 (10th Cir. 2004), where the

claimant met the requirements of Listing 12.05(C) and received Social Security benefits.

Witt's evidence does not establish significant limitations in adaptive functioning that

initially manifested prior to age twenty-two. First, Witt's evidence of below average intelligence

includes: (1) poor marks in special education courses in high school, (2) findings by Dr. Karr and

Dr. Caruana that Witt has weak memory, thought, and organization skills, and (3) the ALJ's

statement that Witt is "easily led." (Pl.'s Br. at 8-13.) The ALJ addressed Witt's below average

intelligence in his decision, explicitly adopted Dr. Karr's diagnosis of learning disabilities, and

noted that Dr. Caruana did not offer a specific diagnosis of any kind. (R. at 18.) The ALJ then

explained that, despite suffering from learning disabilities and receiving poor marks in special education classes, Witt successfully graduated from high school and worked steadily in competitive, remunerative employment from 1981 until 1999. (Id.) Furthermore, during his working years, Witt held jobs for as many as eight consecutive years and usually left jobs voluntarily in pursuit of higher wages. (Id.) While Witt points out that he was fired from his last job for working too slowly, that incident appears to be an exception to the norm in Witt's rather stable work history. SSA regulations indicate that, in the context of mental retardation, an ability to hold a job is particularly useful in determining the individual's ability or inability to function in a work setting, *Williams v. Sullivan*, 970 F.2d 1178, 1185 (3rd Cir. 1992) (citing 20 C.F.R. § 404, Subpt. P, App. 1, § 12.00(D)), and the ALJ in this case clearly agreed. Finally, the ALJ's statement, "while [Witt] seemed honest at the hearing, he responded in a rather slow, simple fashion, and seemed to be easily led," (R. at 17), is consistent with Witt's low IQ and learning disabilities but does not constitute additional evidence of deficits in adaptive functioning.

Witt alleges that his inability to live on his own and his lack of social interaction constitute significant limitations in adaptive functioning. Specifically, Witt argues that (1) he spent his entire life in a structured home environment supervised by his family and that he cannot survive without that help and structure, and (2) he has very limited social and interpersonal relationships, gets into fights, and is generally socially maladjusted. (Pl.'s Br. at 10-11.) The ALJ rejected these arguments and found that Witt is married, engages in social activities, such as dancing, bowling, and cycling, and engages in daily activities, such as driving, shopping and working around his house and yard. (R. at 18-19.) Witt also has hobbies, such as model trains. (R. at 19.) At the ALJ hearing, Witt testified that he rarely bowls, cycles, or goes for long drives,

- 18 -

but admitted that he is still capable of performing these activities, he just has not done so lately. (R. at 285.) Finally, as stated above, Witt's successful work history suggests that his social and interpersonal skills are strong enough for him to function in certain work environments.

Next, Witt claims that Dr. Caruana found him to be mildly mentally retarded. In his report, Dr. Caruana found that Witt had a verbal IQ of 67, placing Witt in the "mild mental retardation range." (R. at 72.) Significantly, of the IQ scores recorded by Dr. Caruana, only Witt's verbal IQ fell in the 60 to 70 range required by subsection (C) of Listing 12.05. If Witt is correct, and a verbal IQ score of 67 satisfies subsection (C) of Listing 12.05 and establishes deficits in adaptive function, then there is no difference between those two parts of Listing 12.05(C)'s test and the requirements set out in the capsule are redundant. This is an impermissible outcome and the Court will not give Witt's verbal IQ score more weight than it deserves. Thus, while both Dr. Karr and Dr. Caruana found that Witt has a low IQ—and IQs generally remain the same over time, *Muncy v. Apfel*, 247 F.3d 728, 734 (8th. Cir. 2001); 65 Fed. Reg. 50,753 (2000)—the Court will not collapse Listing 12.05(C)'s three-part test into two parts. Accordingly, Dr. Caruana's elaboration on the significance of Witt's verbal IQ does not constitute additional evidence of mental retardation.

Finally, Witt's reliance on *Barnes v. Barnhart* is entirely misplaced. In *Barnes*, the claimant alleged mental retardation that manifested itself prior to age twenty-two and presented evidence that included a poor academic record, an inability to live outside structured family environment, a failed marriage, and an inability to remain employed. 116 Fed. Appx. at 940-42. In fact, the claimant in *Barnes* was placed in special education classes but dropped out of school after tenth grade, was divorced after only two months of marriage, lived with her mother because

she was mentally incapable of taking care of her home or children, had no friends, and failed to keep any job for more than a few weeks, at one point holding four different jobs over the course of a few weeks. *Id.* The ALJ in *Barnes* rejected the claimant's arguments and found that her usual daily activities, social life, and educational background failed to show deficits in adaptive behavior sufficient to meet the capsule definition for Listings 12.05(C) and (D). *Id.* at 941. On appeal, the Tenth Circuit found that the ALJ failed to properly define adaptive functioning, rejected the ALJ's "summary analysis," and then ruled that the claimant's evidence established deficits in adaptive functioning. *Id.* at 941, 943.

Unlike *Barnes*, the ALJ in this case considered the factors and evidence that pertain to an individual's adaptive functioning, as defined by the DSM-IV—the same factors and evidence that Witt argues—and rejected Witt's claim because he graduated high school, worked successfully for almost twenty years, has a successful marriage, and is capable of social functioning. In short, the evidence of deficits in adaptive functioning in this case is much weaker than *Barnes*, while the ALJ's analysis of that evidence is much stronger than *Barnes*. Because the ALJ assessed the proper elements and reached a reasonable and justifiable conclusion, *Barnes* does not change the outcome of this case.

Based on the above, Witt has not established that he suffers deficits in adaptive function and he does not meet the capsule requirement under Listing 12.05.

**D.    The ALJ's Conclusions at Steps 4 and 5 Were Flawed Because the Hypotheticals Presented to the VE Did Not Contain Proper Physical or Mental Assessments.**

At Steps 4 and 5, the ALJ relied on VE testimony and concluded that Witt can return to his previous relevant work and is capable of performing SGA in the national economy. An ALJ may rely upon VE testimony when "all relevant limitations from which the claimant suffers" have been presented to the VE. *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003). A failure to include the relevant limitations will impair the VE's ability to accurately determine the work which the claimant may perform. *Id.* This is especially true when assessing a claimant's ability to perform his past relevant work, as the past relevant work analysis focuses on how the claimant actually performed his past work, how his past work is generally performed, and requires the ALJ to evaluate the specific mental and physical skills necessary for the work involved. *Smith v. Barnhart*, 388 F.3d 251, 252-53 (7th Cir. 2004) (ALJ's failure to consider whether claimant can perform specific duties of past relevant work is an error of law requiring remand); *Nolen v. Sullivan*, 939 F.2d 516, 518-19 (7th Cir. 1991) (ALJ must list specific physical requirements of previous job and assess claimant's ability to perform these tasks). Witt challenges the ALJ's mental and physical RFC conclusions and argues that the ALJ cannot rely on the VE's testimony because the hypotheticals presented to the VE were flawed. Specifically, Witt claims that the ALJ (1) failed to apply the "special technique" described in 20 C.F.R. § 404.1520a, (2) failed to properly construct Witt's mental RFC, and (3) made improper credibility findings regarding Witt's pain and physical RFC. (Pl.'s Br. at 16.)

1. The ALJ's Mental Assessment Was Flawed Because
He Did Not Apply the Special Technique, Nor Evaluate
Witt's Impairments On a Function By Function Basis.

In this case, the VE could not offer reliable testimony at Steps 4 and 5 because the ALJ

did not provide him with accurate hypotheticals regarding Witt's mental capacity. Specifically,

the ALJ failed to apply the Commissioner's special technique after finding that Witt did not meet

Listing 12.05(C) and failed to assess Witt's mental RFC on a function by function basis.

a    The Commissioner's special technique

The Commissioner's special technique must be used at each level of the administrative

review process when a claimant has alleged mental impairments. 20 C.F.R. § 404.1520a. The

special technique requires the ALJ to rate the degree of mental functional limitation in the four

areas of: a) activities of daily living, b) social functioning, c) concentration, persistence or pace,

and d) episodes of decompensation. Id. The first three categories must be ranked on a five-point

scale ranging from none, mild, moderate, marked, and extreme. Id. The last category will be

ranked on a four-point scale ranging from: none, one or two, three, four or more. Id. The ALJ

must document the application of this technique and make specific findings as to how the

claimant rates in the four areas listed above. Id. At Step 3, the ratings established under the

special technique are used in conjunction with medical findings to determine whether a listing is

met. Id. Failure to apply the special technique may be grounds for remand.

The ALJ failed to apply the Commissioner's special technique at Step 3 of his analysis.

In his decision, the ALJ made no mention of the special technique, nor did he rate Witt's

functional limitation in any of the areas required by the regulation. In her response brief, the

Commissioner addresses the ALJ's failure to apply the special technique in a footnote and argues that there are no perfect opinions and that the special technique would not change the outcome of the case because the ALJ already concluded at Step 2 that Witt's impairments were "severe." (Def.'s Br. at 13.) While the Court agrees that special technique findings would not change the analysis of Witt's deficits in functioning prior to age twenty-two, and therefore not change the ALJ's findings at Step 3, the special technique findings are important to a complete assessment of Witt's mental capabilities and do affect his mental RFC. In short, the special technique is not only used to determine severity but also to determine the "functional consequences of the mental disorder(s) relevant to the complainant's ability to work." 20 C.F.R. § 404.1520a.

### b. Mental RFC

At Step 4, the ALJ must perform a RFC and mental RFC analysis. 20 C.F.R. § 404.1520(f); SSR 96-8p. The RFC is the most a claimant can perform despite his or her limitations. 20 C.F.R. § 404.1545(a). If the claimant has more than one impairment, the ALJ will consider them all, regardless of whether they are classified as "severe." Id. An ALJ's failure to explain how he arrives at an RFC is ground for remand. *Briscoe ex. rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). Under SSR 85-16, mental impairments must be considered in "a detailed assessment of the individual's capacity to perform and sustain mental activities which are critical to work performance." SSR 85-16 points to 20 C.F.R. §§ 404.1545(c), 416.945(c) and lists several factors that must be considered such as psychological evaluations, the ability to sustain activities, interests, and relate to others, and the ability to function in a work-like situation. Id. Furthermore, SSR 96-9p acknowledges that mental abilities are required for

competitive, remunerative unskilled work and that a less than substantial loss of ability to perform any of the basic work activities may significantly erode the unskilled occupational base. SSR 96-9p. Thus, a function by function assessment is critical, as a claimant's condition may make performance of even an unskilled job as difficult as an objectively more demanding job. SSR 85-15.

In his decision, the ALJ noted that (1) Witt claims his memory is questionable but denies any persistent problems in that regard, (2) Witt did not report any psychiatric symptoms, such as depression or anxiety, and (3) Dr. Karr found that Witt suffers marked restrictions in his ability to understand, remember and carry out detailed instructions, and moderate restrictions in his ability to make judgments on simple work-related decisions. (R. at 19.) Based primarily on Dr. Karr's findings, which the ALJ found to be "reasonable in view of the preponderance of the evidence," the ALJ concluded that Witt's learning disorder and low IQ limit him to "one- and two-step jobs requiring a low degree of concentration." (Id.)

The ALJ's mental RFC finding is insufficient. As an initial matter, the ALJ never completed a Mental RFC assessment, as set out in SSA Form SSA-4734-F4-SUP (8-85). The SSA Form asks detailed questions about the claimant's capacity to sustain various work related activities that require understanding, memory, concentration, persistence, social interaction, and adaptation, over the course of a work day, and is an important tool in ensuring that disability determinations are based on a full and complete record. Next, the ALJ agreed with, and purported to adopt, Dr. Karr's specific findings regarding Witt's ability to make judgments and understand, remember and carry out instructions, but never presented Dr. Karr's findings to the VE. As stated above, a function by function assessment is critical, as a claimant's condition may

make performance of even an unskilled job as difficult as an objectively more demanding job. SSR 85-15. While the record makes clear that Witt has significant learning disabilities and below average intelligence that may affect his ability to work, the VE was never provided with an in depth analysis of Witt's mental capacity.

The only information the VE received regarding Witt's mental limitations was the ALJ's own conclusion that Witt was limited to a "simple one, two-step job requiring only low degrees of concentration." (R. at 311.) The VE was never presented with a complete mental assessment, nor Dr. Caruana or Dr. Karr's evaluations, as both were conducted after the ALJ hearing. As a result, the hypotheticals presented to the VE lacked specific descriptions of Witt's mental abilities, including Dr. Karr's findings of marked restriction in understanding, remembering, and carrying out detailed instructions, and a moderate restriction in making work-related decisions. (R. at 173.) By simply setting out his "one- and two-step" conclusion without properly explaining the nature and extent of Witt's mental strengths and weaknesses, the ALJ skipped too many intermediate steps en route to his mental RFC conclusions and VE hypotheticals. This need for more detailed information is evident in the VE's testimony itself, as the VE suggests that describing Witt's past relevant work as "one- and two-step" jobs may be a confusing oversimplification. (R. at 312-13.) In sum, because the ALJ did not analyze Witt's mental strengths and weaknesses on a function by function basis, the VE was deprived of accurate and/or comprehensive hypotheticals and could not provide reliable testimony regarding Witt's ability to engage in SGA or perform his past relevant work.

## 2. The ALJ's Credibility Determination and Physical RFC Assessment Were Flawed.

In addition to conducting a mental assessment, at Step 4, the ALJ evaluated Witt's physical RFC. After reviewing the evidence and testimony, the ALJ rejected portions of Witt's testimony, finding that Witt "exaggerate[d] his physical limitations to some extent." (R. at 19.) The ALJ believed that Witt had greater physical abilities than was alleged because (1) Dr. Jain reported that Witt claimed he could lift fifty pounds, (2) Witt did not see a physician or take prescription medications for his impairments, (3) Witt failed to present evidence of back impairments but did report a positive response to over-the-counter medications, and (4) Witt engaged in activities such as dancing, automobile trips, bicycling and bowling. (Id.) Based on this evidence, the ALJ determined that Witt could carry/lift up to twenty-five pounds frequently and fifty pounds occasionally and sit, stand, and/or walk six hours during an eight-hour day. (Id.) The ALJ also found that Witt needs to work in a clean atmosphere because of his COPD. (Id.)

Witt challenges the ALJ's physical RFC determination and claims that the ALJ made improper credibility findings as to Witt's alleged physical limitations. Witt argues that Dr. Jain most likely made a typographical error when she reported that Witt could lift fifty pounds as opposed to five pounds because five pounds is consistent with his disabling pain and hernia. (Pl.'s Br. at 19.) Witt also points to SSR 96-7p, which states that the adjudicator must not draw conclusions from a claimant's failure to pursue medical attention without first considering the claimant's reasons for not doing so. (Id.) Finally, Witt cites to *Carradine v. Barnhart*, 360 F.3d 751 (7th Cir. 2004), for the proposition that his complaints of hernia, back, and wrist pain must be fully credited and explored because they are supported by medical evidence.

When assessing credibility, resolution of competing arguments based on the record is for the ALJ, not this Court. *Donahue v. Barnhart*, 279 F.3d 441, 444 (7th Cir. 2002). On appeal, the ALJ's credibility findings will not be disturbed unless they are patently wrong. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). Where a claimant produces medical evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence. *Carradine*, 360 F.3d at 753; *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003). Rather, the ALJ's reasons must be supported by record evidence and be sufficiently specific to make clear to the claimant and to any subsequent reviewer the weight given to the claimant's statements and the reasons for that weight. *Lopez*, 336 F.3d at 539-40. The ALJ must take care to articulate which information he relies upon when making his determinations and findings. *Zurawski*, 245 F.3d at 887 (ALJ must evaluate which allegations are credible and which are not credible); *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (ALJ must sufficiently articulate his assessment of the evidence to allow the court to trace the path of the reasoning); *Zblewski v. Schweiker*, 732 F.2d 75, 78-79 (7th Cir. 1984) (where ALJ fails to mention rejected evidence, the reviewing court cannot discern if significant evidence was credited or simply ignored). Furthermore, the ALJ must consider specific factors when assessing the credibility of an individual's statement. For example, under SSR 96-7p, the ALJ must consider: daily activities; the type dosage, effectiveness, and side effects of medication taken by the claimant; treatment other than medication used to alleviate pain; and reasons the claimant may not seek treatment for pain.[5] SSR 96-7p.

---

[5] SSR 96-7p, in its entirety, directs the ALJ to consider: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other
(continued...)

The ALJ was appropriately skeptical of Witt's complaints of back and wrist pain. First, there is no evidence in the record that Witt ever complained to a doctor about back pain, nor is there evidence of any back problem. Furthermore, at the ALJ hearing Witt testified that, if not for his nasal problems and hernia, he would have no complaints of pain, (R. at 260, 281), and specifically stated that he was not experiencing back pain at the time. (R. at 281.) Witt also complained of wrist pain, (R. at 133), but his testimony suggested that his wrist pain was not a significant issue. Specifically, Witt testified that only certain actions cause him wrist pain and that he is capable of performing some of his past relevant work without aggravating his wrist. (R. at 283, 321-22.) Witt also said that over-the-counter medications effectively help him cope with pain.

The ALJ's assessment of Witt's hernia pain is problematic. Witt complained consistently about a hernia, which he claims developed some time after he stopped working. Witt describes the hernia pain as located in his waist and genitals and occurring several times per week, including when he walks, sits, and during sexual intercourse. (R. at 258, 271, 276.) As a result of his hernia pain, Witt claims that he can lift only five to ten pounds. (R. at 271.) While Witt testified that the pain he associates with a hernia is often alleviated by taking aspirin and other over-the-counter medications, (R. at 275), he made clear that the pain is disabling on a regular basis nonetheless.

---

[5](...continued)
symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for fifteen to twenty minutes every hour, or sleeping on a board); and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

The ALJ found it significant that Witt has not been to a doctor for his hernia and does not take prescription medication, however, Witt told Dr. Jain that he cannot afford a medical doctor and, therefore, has not seriously pursued testing or surgery. (R. at 144.) This is significant, as the ALJ should ask the claimant whether there is a good reason for a failure to procure medical assistance before drawing a negative credibility inference. SSR 96-7p. Furthermore, Dr. Jain's December 2001 exam was inconclusive, finding that "there is a slight, mild fluctuation in the right inguinal region without clear cut hernia present at the present time." (R. at 146.) This statement clearly leaves open the possibility that Witt does have a hernia or may have a hernia in the not-too-distant future, which is significant because it suggests that Witt's complaints of pain may be corroborated by medical evidence in the record and, therefore, entitled to greater weight. *See Carradine*, 360 F.3d at 753.

In *Carradine*, the ALJ rejected the claimant's complaints of pain as (1) exaggerated due to her psychological impairments, (2) uncorroborated by objective medical evidence, and (3) undermined by her ability to perform a few daily activities, such as walking and swimming. *Id.* at 754-56. The Seventh Circuit reversed the ALJ's decision and found that (1) reports of pain are not to be discredited merely because they have a psychological and not physical source, (2) severe pain may exist even if there is no objective medical evidence supporting the claim, and (3) a claimant's ability to perform some physical activities does not mean that she is able to work an eight hour day, especially when the claimant's physical activities are part of a rehabilitation program or do not involve work-related skills. *Id.*

In this case, there is medical evidence in the record that supports Witt's complaints of hernia pain, namely Dr. Jain's report. While Dr. Jain's findings may not be "clear cut" and may

not suggest an extremely painful medical condition, under *Carradine*, the ALJ may not simply assume that the pain is insignificant. Next, while Witt is much more active than the claimant in *Carradine*, his activities do not necessarily undermine his complaints of pain. Witt stated that he is capable of dancing, driving, cycling, and bowling and that his disabilities have not disrupted his daily activities too dramatically. (R. at 19.) Clearly, Witt's activities are qualitatively different than those performed by the claimant in *Carradine*, where the claimant went for therapeutic walks and engaged in physical rehabilitation exercises and swimming. Nonetheless, Witt's activities of daily living do not prove that he can work an eight-hour day five days a week, nor do they rule out the possibility that he suffers from a hernia and cannot lift fifty pounds occasionally or twenty-five pounds frequently.

Finally, while the Court is not convinced that Dr. Jain's December 2001 report that Witt can lift up to fifty pounds is a typographical error, it is a possibility. According to Dr. Jain, in December 2001, Witt claimed that he could not lift more than fifty pounds. The ability to lift anything close to fifty pounds is inconsistent with Witt's ongoing complaints of pain and his January 2002 claim that Dr. Shah instructed him not to lift more than ten pounds. (R. at 114.) At best, then, Dr. Jain's fifty pound notation is based on statements that Witt completely disavowed less than two weeks later,[6] so the Court finds that Dr. Jain's notation is not entitled to much weight.

---

[6] Witt did indicate in his November 2001 SSA Disability Report that the heaviest weight he frequently lifted for work was over fifty pounds, (R. at 90), but that statement is not inconsistent with his complaints of hernia related pain, which he says began after he stopped working.

### 3. The VE's Testimony Is Not Substantial Evidence In This Case.

The hypotheticals posed to the VE in this case were not based on accurate or comprehensive mental or physical RFCs so they could not general reliable testimony. The fact that both RFCs were flawed is critical, as the VE believed Witt could find work even if he was restricted to sedentary jobs and could lift ten pounds only. Without a thorough function by function assessment of Witt's mental limitations, however, the VE lacked a clear picture of Witt's overall capabilities and could not reliably determine Witt's ability to perform his past relevant work or other jobs in the national economy. SSR 85-15; SSR 85-16.

### E.     Subsequent Hearing

Finally, Witt argues that he was improperly denied a subsequent hearing after the ALJ received evidence from Dr. Caruana and Dr. Karr. (Pl.'s Br. at 14-15.) Witt cites the SSA Law Manual and states that parties must have the opportunity to "object to, or refute the evidence by submitting other evidence, requesting a supplemental hearing, or if required for a full and true disclosure of the facts." (Pl.'s Br. at 15.) In this case, Witt waived the opportunity for a subsequent hearing by ignoring the ALJ's offer to conduct such a hearing and requesting that the ALJ press on and issue a decision. After receiving Dr. Karr's consultative examination, the ALJ sent Witt a copy of Dr. Karr's findings and a notice that read:

> If I do not receive a response from you within 10 days of the date you receive this notice, I will assume that you do not wish to submit any written statements or records and that you do not wish to request a supplemental hearing or to orally question the author(s) of the enclosed report(s). I will then enter the enclosed evidence in the record and issue my decision.

(R. at 67.) Witt responded within ten days and offered his interpretation of Dr. Karr's findings, as well as the results of Dr. Caruana's consultative examination. Witt then asked the ALJ to take all of his comments and evidence under advisement and "render a decision at your earliest possible convenience . . . ." (R. at 70.) Having requested that the ALJ render a decision, Witt cannot now claim that he was denied an opportunity for a supplemental hearing.

### III. Conclusion

For the reasons stated above, the Commissioner's decision is vacated and remanded for further proceedings consistent with this Memorandum Opinion and Order. For the same reasons, Witt's motion for summary judgment is granted in part and denied in part, and the Commissioner's motion for summary judgment is denied.

**ENTER ORDER:**

**MARTIN C. ASHMAN**
United States Magistrate Judge

Dated: August 22, 2006.

Copies have been mailed to:

FREDERICK J. DALEY, JR., Esq.
Daley, DeBofsky & Bryant
1 North LaSalle Street
Suite 3800
Chicago, IL 60602

Attorney for Plaintiff

MS. SARA E. ZEMAN
Special Assistant U.S. Attorney
200 West Adams Street
30th Floor
Chicago, IL 60606

Attorney for Defendant